FILED
11/13/2023
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 12, 2023 Session

## ASHLEIGH SUAREZ SMALLMAN v. WILLIAM H. SMALLMAN

**Appeal from the Circuit Court for Davidson County**
**No. 18D-1109      Phillip R. Robinson, Judge**
_____

**No. M2022-00592-COA-R3-CV**
_____

This is a post-divorce action in which both parents seek to modify the permanent parenting plan and the father seeks to reduce his financial support obligations. The mother filed her Petition to Modify Permanent Parenting Plan in which she requested, *inter alia*, a reduction of the father's parenting time and that she be awarded sole decision-making authority for the non-emergency medical and educational decisions for the parties' two minor children. The father filed his Counter-Petition to Modify the Parenting Plan seeking, *inter alia*, that he be awarded the tie-breaking vote for all medical decisions for the children; that joint decision-making authority for educational decisions be maintained between the parties; that his financial obligations be modified, including child support as well as previously agreed-upon additional educational and medical expenses; and that he be awarded more parenting time. Following a trial that spanned 10 days, the trial court found in a 53-page memorandum opinion and final order that neither party proved a material change of circumstance that justified modification of the parenting schedule. However, the court found the parents' inability to successfully co-parent under the existing joint decision-making provision adversely affected the children's non-emergency healthcare and educational needs. The court also found that it was in the children's best interests that the "[m]other have sole decision-making authority over their non-emergency healthcare and day-to-day education, free of any interference or delays by the father and without being required to consult with him in advance." The court denied the father's request to modify child support as well as his request to modify responsibility for educational, medical, and extracurricular expenses. The father appeals. We affirm the trial court in all respects. We also find that the mother is entitled to recover the reasonable and necessary attorney's fees and expenses she incurred in defending this appeal and remand this issue to the trial court to make the appropriate award.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the court in which W. NEAL MCBRAYER and JEFFREY USMAN, JJ., joined.

- 1 -

Gregory Dye Smith, Ashley Goins Alderson, and Brenton Hall Lankford, Nashville, Tennessee, for the appellant, William H. Smallman.

Helen Sfikas Rogers, Eugene Frank Guerre, III, and Ethan Rogers Page, Nashville, Tennessee, for the appellee, Ashleigh Suarez Smallman.

## OPINION

### FACTS AND PROCEDURAL BACKGROUND

William H. Smallman ("Father") and Ashleigh Suarez Smallman ("Mother") were divorced on April 26, 2019. Their Final Decree of Divorce incorporated the parties' Marital Dissolution Agreement ("MDA") and Permanent Parenting Plan ("Parenting Plan"). They have two minor children, William and Claire, who were ages seven and twelve, respectively, when the competing petitions to modify the Parenting Plan were tried.

During the marriage, Mother was a homemaker. She has not worked outside of the home since the divorce with the exception of casual sales of her artwork. Father is a real estate professional who derives the bulk of his income from speculating and developing property.

Under the MDA, Mother was awarded approximately 18 pieces of real property worth an estimated $7.8 million, most of which were income producing rental properties.[1] Father was awarded approximately 37 pieces of real property with an estimated value of $12.4 million, only some of which were income producing.

Under the agreed-upon Parenting Plan, Mother was designated as the primary residential parent and was awarded 232.5 days of parenting time. Father was designated as the alternate residential parent and was awarded 132.5 days of parenting time.

The parties agreed to joint decision-making authority with respect to all major decisions, except that Mother had tie-breaking authority with respect to non-emergency medical decisions. Moreover, the parties agreed "to follow the recommendations of the child(ren)'s medical providers, educational professionals, therapists, and medical specialists" and "to properly and timely administer any medication prescribed for their children."

The Parenting Plan stated that Father's gross monthly income for child support purposes was "over $100,000 per month," and Mother's gross monthly income was $15,000 per month. As a consequence, Father's monthly child support obligation was set at $3,200 a month, the maximum presumptive amount of child support for two children

---

[1] Mother's annual income was from the rental properties was $203,461.58.

under Tennessee's Child Support Guidelines. *See* Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(g).

The Parenting Plan further provided that Father would pay uncovered medical expenses up to $25,000 per annum and that any expenses beyond $25,000 would be paid *pro rata*. Father agreed to continue to pay for the children's private school tuition and expenses at the children's present school[2] or any future school, and Father likewise agreed to pay the first $5,000 for each child of any costs for agreed-upon extracurricular activities. Any benefits over $5,000 were to be paid *pro rata* between the parties "as set forth on the Child Support Worksheet then in effect."

*Post-Divorce Conflicts*

Conflicts between the parties began soon after the divorce. One such conflict occurred when Father began building a home in Mother's neighborhood. Uncomfortable with this living arrangement, Mother relocated to a different area of town. Shortly thereafter, Mother found Father standing in her kitchen—uninvited—seeking to discuss the Parenting Plan. Father then repeatedly began asking Mother to meet with him over coffee to discuss the Parenting Plan. Mother made it clear that she did not wish to do so. However, Father continued to insist.

Thereafter, Mother sent Father an email to establish boundaries. From then on, when Father would bring the children to Mother's home for her parenting time, Father would park at the bottom of the hill and make the children haul their belongings up the hill. When the children would ask for Father's assistance, Father would tell the children that he was "not allowed" to assist them. Mother also testified that Father often portrays himself to the children as a victim and speaks to the children about how he would like more parenting time with them. Father has admitted under oath that he has told Mother that, if she does not talk to him, he will be compelled to discuss these issues with the children.

The parties also experienced frequent and significant disagreements regarding how to manage the medical issues of their eldest child, Claire. At the time of the divorce, Claire was dealing with a variety of medical issues, including ADHD, anxiety, trichotillomania, and OCD, for which she was prescribed various medications and saw several providers. In April 2019, Claire's symptoms were diagnosed as PANDAS, an autoimmune disorder that can cause a number of behavioral changes.[3] The parties discussed possible treatments with

---

[2] We have chosen to not identify the names of the children's schools for privacy issues.

[3] PANDAS is short for Pediatric Autoimmune Neuropsychiatric Disorders Associated with Streptococcal Infections. *In re Jackson H.*, No. M2014-01810-COA-R3-JV, 2016 WL 6426742, at *7 n.7 (Tenn. Ct. App. Oct. 28, 2016). PANDAS has been described as "a condition in which a streptococcal infection in a child or adolescent causes the abrupt onset of clinically significant obsessions, compulsions,

Claire's rheumatologist, including a blood transfusion that could help calm her immune system. But the rheumatologist recommended that the parties seek a second opinion before initiating the treatment.

The parties agreed to take Claire to Duke University for a second opinion, but they could not agree on a date for the appointment. At the time of the referral, the first appointment available was on July 22, 2019. Because Father planned to take the children on a family trip in July, he asked if the appointment could be moved to mid-August. However, Mother would not be available in mid-August and desired to proceed with the July appointment given that it was the earliest possible date that Claire could be seen.

Six days before the appointment, Father notified Mother that he would be accompanying her and Claire to the appointment. In the interim, Father insisted that Claire's treatment stop until she had been seen by the doctors at Duke. When Father finally alerted Mother of his plans to attend, he booked tickets for Claire and himself on the same flight for which Mother had already reserved tickets. The doctors at Duke ultimately determined that Claire did not suffer from PANDAS, but that she instead was likely suffering from Tourette syndrome.[4]

In June 2019, Father and Mother agreed for Claire to begin attending therapy at Nurture House to help treat her OCD. Upon Claire's graduation from Nurture House, her therapist recommended Nashville OCD and Anxiety Treatment Center ("NOCD") to continue her OCD therapy. Mother thus contacted NOCD for an intake appointment. After five days, Father responded and expressed anger that Mother had made initial contact with NOCD without his involvement. Father then proceeded to unilaterally cancel the appointment.

Several weeks later, Claire was seen by a therapist at NOCD and began showing some improvement. However, during a session with the parents, the NOCD therapist became aware that Father was recording the session without the knowledge or consent of either herself or Mother.[5] Shortly thereafter, the Director of NOCD terminated Claire's

---

tics, or other neuropsychiatric symptoms or behavioral changes, or a relapsing and remitting course of symptom severity." Minn. Stat. § 62A.3097(c).

[4] Tourette syndrome is "a tic disorder appearing in childhood, characterized by multiple motor tics and vocal tics present for longer than 1 year." *Stedmans Medical Dictionary* (Lippincott, Williams, & Wilkins 27th ed. 2000), available on Westlaw at STEDMANS 889480 (updated Nov. 2014).

[5] In its final order, the trial court noted that Mother also admitted to recording some of the NOCD therapist's treatment recommendations without the therapist's knowledge or permission.

care and referred the parties to the Village of Kairos, a center specializing in therapy for both parents and children in high-conflict cases.[6]

In February or early March 2020, the parties met with Claire's psychiatrist to address ADHD treatment options. Father disagreed with Mother and Claire's psychiatrist as to whether to place Claire on medication for ADHD. Father then suggested the possibility of a conflict of interest due to the fact that the psychiatrist was also treating Mother. The psychiatrist acknowledged this potential conflict and withdrew from treating Claire. Thereafter, Mother immediately began to seek referrals for another psychiatrist who could prescribe medication for Claire. The child's previous doctor informed the parties that a doctor specializing in ADHD could potentially see the parties before the end of the month. However, Father refused to agree to a date for an intake appointment with the new doctor, further delaying Claire's treatment. Mother then found a new psychiatrist for Claire.

Father has repeatedly insisted on being a part of every action by Mother in dealing with healthcare providers. This has resulted in the parties copying one another on all communications regarding Claire with both her psychiatrist and her therapist. Claire's new psychiatrist has noted that it would be more appropriate to discuss the threads she is receiving in an in-person session. Father has also questioned whether Claire should be on medication, even when her doctors recommend it. On multiple occasions, Father has suggested to Claire's psychiatrist that the child should switch medications. Father's suggestions stemmed from Claire's opinion that she did not feel that her medication was working, the effects of a different medication on one of Claire's friends, and the effect of a different medication on the daughter of Father's girlfriend. On another occasion, Father relayed to the psychiatrist that Claire had skipped her prescribed Ritalin and that she seemed more patient and relaxed. Father went on to suggest that a combination of different medications might benefit his daughter.

As Claire began her fourth-grade year, she began to struggle with math, completing homework assignments, and transitioning between classrooms during the school day. Both of Claire's fourth-grade teachers testified that Claire had attention span issues and that she would frequently pull out her eyebrows during class. The teachers also testified that fifth-graders at their school are expected to be more self-sufficient, are given more homework, and must transition between multiple classrooms during the day. Thus, both of Claire's teachers opined that fifth-grade would likely prove difficult for Claire.

In light of this advice, Mother began searching for a school that would better serve Claire's needs. Ultimately, Mother landed on a school that serves students with learning differences (hereinafter "the new school"), which she had learned about from healthcare providers and other parents. Despite the fact that Claire's teachers had alerted Father to Claire's struggles, Father refused to consider any other school as a possibility. Father

---

[6] The decision was made by the Director after discussing the issue with the attorney for NOCD.

claimed that Claire had strong social connections at her present school and would have trouble transitioning to the new school. In an email dated January 21, 2020, Father stated the following:

> Claire is a beautiful and healthy young girl. Yes, she has anxiety. She does not have pandas. ***She is not a special needs kid***. She does not need therapy every week. She is a human with ups and downs just like all of us. This multi-year [sic] search to find something wrong with her needs to end.

(Emphasis added).

Feeling that Father was in denial about the severity of Claire's medical issues and her ability to succeed at her present school, Mother unilaterally sent an application to the new school in March of 2020.

As a result of the parties' co-parenting issues and Father's refusal to consider the new school, Mother filed her Petition to Modify the Permanent Parenting Plan and Request for Restraining Orders on April 9, 2020. Mother requested that Father's parenting time be decreased to eighty days, that she be awarded sole decision-making authority with respect to major medical and educational decisions, and that the court order that Claire remain at the new school for the 2021–2022 school year unless the parties agreed otherwise. Mother also requested that she be awarded attorney's fees. Father filed a response in opposition to Mother's petition, in which he opposed Claire attending the new school.

Due to the time-sensitive nature of the school issue, Mother asked the trial court to bifurcate the trial to hear the educational portion first. The court held a remote hearing on Mother's Petition on April 15, 2020. The court ordered that both parties refrain from discussing the pending litigation, past divorce issues, or adult issues regarding treatment with the minor children. The court also ordered that the parties refrain from making inappropriate comments directed at the other parent. The court further allowed Mother to move forward with the application process for Claire at the new school. The trial court enjoined and restrained Father from interfering with the application for the new school or from taking any action that might undermine the application. The court also prohibited Mother from scheduling medical appointments during Father's parenting time and prohibited Father from canceling or terminating any medical appointments scheduled by Mother. The court further ordered that Father respond to Mother's notices regarding medical decisions affecting the children within 24 hours. Additionally, the court granted Mother's request to bifurcate the trial and scheduled a hearing on the school issue only for July 22, 2020.

Days before the hearing, the parties toured the new school and Father agreed to allow Claire to attend the school. In a subsequent agreed order, Father withdrew his objection to Claire attending the new school for the 2020–2021 school year. Additionally,

the order provided that the allocation of final costs on the school issue—including reasonable attorney's fees and discretionary costs—would be reserved for the final hearing.

Mother then filed an amended petition that was substantially similar to the original, requesting that the court (1) reduce Father's parenting time to eighty days per year; (2) award her sole decision-making authority for the medical and educational decisions for the children; (3) order that Claire remain at the new school for the 2021–2022 school year, unless the parties agreed otherwise; and (4) award Mother her attorney's fees.

Father then filed his Response in Opposition to Mother's Amended Petition, along with his Amended Counter-Petition to Modify the Parenting Plan, seeking the following: (1) that he be awarded the tie-breaking vote for all medical decisions for the children or, alternatively, that the court award joint decision-making authority to the parties without a tie-breaking provision; (2) that the court maintain joint decision-making authority between the parties as to educational decisions for their children; (3) that the court modify his obligation for educational and uncovered medical expenses; (4) that the court modify his child support obligation; (5) that the court award him slightly more parenting time; and (6) that the court award him attorney's fees and costs.

*The Final Order*

On April 7, 2022, the trial court entered a final order addressing each of the parties' underlying petitions. The court denied the parties' requests to modify the parenting schedule, holding that there had not been a sufficient material change of circumstance. As to the parties' request to modify decision-making authority, the trial court found that Mother made beneficial medical and educational decisions on behalf of the children, while Father had demonstrated a pattern of delaying the children's treatment and denying the seriousness of their health issues. More specifically, the court made the express finding that the parents' inability "to successfully co-parent" pursuant to the existing joint decision-making provision adversely affected the children's non-emergency healthcare and educational needs. The court also found it was in the children's best interests that "Mother have sole decision-making authority over their non-emergency healthcare and day-to-day education, free of any interference or delays by the Father and without being required to consult with him in advance." However, the court held that Mother may not change the children's school without written agreement from Father and ordered her to email Father a monthly educational and medical report on the children. The court also granted Father permission to schedule a session once a month with any of the children's health care providers to receive a report on the children's health, and it ordered Father to administer the children's medicine as prescribed.

Regarding Father's Petition to Modify Child Support, the court found that there was no significant variance to justify the modification of Father's child support payment to Mother. This was based on the trial court's finding that Father's 2020 gross income was higher than he claimed.

In choosing from different calculations put forth by Father's forensic accountant, the court found Father's average gross income for child support purposes during 2019 and 2020 to be $768,931. Over Father's objection, the income calculation chosen by the trial court included $1.3 million in post-divorce capital gains that Father realized from the sale of real property he received in the division of the marital estate. Father had placed those proceeds into a Qualified Opportunity Zone Investment ("QOZ"), which allowed him to defer tax liability until 2026. As a result, the gains were not reported on Father's 2020 tax return. Nonetheless, the court held that it was proper to include the capital gains, because, while federal tax law may allow an individual to defer recognition of capital gains for federal income tax purposes under the Internal Revenue Code, the Tennessee Child Support Guidelines specifically include "net capital gains" for purposes of calculating child support. The court also found that it would be inconsistent with the Guidelines to allow Father to manipulate his primary source of income and to reduce his child support obligation while maintaining his elevated lifestyle.

In pertinent part, the trial court reasoned:

Child support in Tennessee is set pursuant to the Child Support Guidelines . . . . In the process of setting child support under the state guidelines, the gross income of each parent shall be determined and "shall include all income from any source (before deduction for taxes and other deductions such as credits for other qualified children), whether earned or unearned, including, but not limited to the following:" the Guidelines then list numerous examples of income which includes standard wages and salaries and income from self-employment and specifically includes net capital gains.

In dealing with self-employment income, the guidelines specifically state:

Income from self-employment includes income from, but not limited to, business operations, work as an independent contractor or consultant, sales of goods or services, and rental properties, etc., less ordinary and reasonably expenses necessary to produce such income.

It is clear to this Court that the definition for income under the Child Support Guidelines and the definition for income under the Internal Revenue Service Code are not the same as the guidelines specifically state:

Amounts allowed by the Internal Revenue Service for accelerated depreciation or investment tax credits shall not be considered reasonable expenses.

(Citations omitted) (quoting Tenn. Comp. R. & Regs. 1240-02-04-.04(3)).

- 8 -

The trial court also found it significant that "Father's sworn monthly income and expense statement, which lists the Father's average monthly expenses from January 1, 2021 to October 31, 2021, reflects average monthly expenses of $18,638.75 or $223,665 annually." The court went on to find:

> The Father testified he was current on all his monthly obligations including his child support obligation. At the bottom of the second page of the expense statement is a note that the Father paid $280,032.87 in legal expenses to his attorneys for the years 2020 and 2021 or $140,016 annually. The legal fees were not included in his monthly expenses. Thus, he also paid approximately $140,016 per year in attorney's fees for the calendar years 2020 and 2021. His monthly expenses ($223,665) and attorney's fees ($140,016) were paid with after-tax dollars or net income. This results in disposable income attributable to the Father of approximately $363,681 in after-tax dollars which he spends maintaining his lifestyle, including his $3,200 per month in his current child support obligation.

For these and other reasons set forth in its final order, the trial court found there was no significant variance between the amount of Father's current presumptive support order and the proposed presumptive support order, each of which was $3,200 per month.

As for Father's request to modify his additional financial obligations for education, medical, and extracurricular expenses, the court found that the agreed Parenting Plan was extensively negotiated a mere 13 months before the filing of his petition and that there was no basis upon which to reduce the additional support obligations that Father had voluntarily assumed. As the court explained:

> Not only did the Father acknowledge that his income and wealth were such that paying the maximum amount of child support under the guidelines for two (2) children was appropriate, but he agreed to additional support obligations to assist the Mother in defraying the cost of caring for the children and maintaining the lifestyle to which the children had become accustomed. Based on this Court's ruling on the Father's income, the Court finds no basis to reduce the additional support obligations which the Father voluntarily assumed.

As for Father's agreement to contribute $10,000 per child per year to the children's college funds, the court held that this was a contractual obligation between the parties and was outside of the scope of the court's jurisdiction in setting child support.

The court awarded Mother $50,000 of her reasonable and necessary attorneys' fees incurred during the school litigation. The court also awarded Mother a portion of her reasonable and necessary attorney's fees incurred in relation to the decision-making dispute

and in resisting Father's request to modify child support. The court also ordered Father to pay court costs.

This appeal followed.

## ISSUES

Father presents eight issues for our review, stated as follows:

I.      Whether the trial court erred in making any modification to the original Permanent Parenting Plan in light of its specific finding that there were no material changes of circumstances since the entry of that plan;

II.     Whether the trial court erred in awarding Mother sole decision-making authority for both non-emergency health care and educational decisions;

III.    Whether the trial court erred in entering certain orders restricting Father's involvement with the children;

IV.     Whether the trial court erred in setting Father's income for child support purposes;

V.      Whether the trial court erred by not reducing Father's base child support obligation;

VI.     Whether the trial court erred in failing to modify each party's respective financial obligations for the children's private school, uncovered medical expenses, and extracurricular expenses;

VII.    Whether the trial court erred in awarding Mother her attorneys' fees, expert expenses, and discretionary costs;

VIII.   Whether Father is entitled to his fees incurred on appeal;

Mother raises one additional issue on appeal, stated as follows:

Whether Mother is entitled to her attorney's fees on appeal as the prevailing party under the enforcement provision of the parties' Marital Dissolution Agreement, or pursuant to Tennessee Code Annotated § 36-5-103(c), and/or pursuant to the discretion of the Court of Appeals.

STANDARD OF REVIEW

In cases such as this, where the action is "tried upon the facts without a jury," Tennessee Rule of Civil Procedure 52.01 provides that the trial court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment. In such cases, our review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *see also Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). "We review the trial court's resolution of questions of law de novo, with no presumption of correctness." *Armbrister*, 414 S.W.3d at 692. "Statutory interpretation is a question of law, which we review de novo." *Id.*

Because "trial courts are able to observe witnesses as they testify and to assess their demeanor, . . . trial judges [are best suited] to evaluate witness credibility." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). As we discuss in more detail below, the trial court in the case at bar made credibility findings. Thus, we "must give 'considerable deference' to the trial judge with regard to oral, in-court testimony as it is the trial judge who has viewed the witnesses and heard the testimony." *Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733 (Tenn. 2002). To this end, "appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells*, 9 S.W.3d at 783 (citations omitted).

## ANALYSIS

### I. MODIFICATION OF THE PARENTING PLAN

The first three issues raised by Father are related and will be discussed together. Father contends that the trial court erred in making any modification to the original Parenting Plan in light of the court's specific finding that there were no material changes of circumstance since the entry of that plan. Alternatively, he contends that the trial court erred in modifying the Parenting Plan by restricting his communication with the children and by awarding Mother sole decision-making authority for both non-emergency health care and educational decisions.

#### A. Material Change in Circumstance

We have determined that Father's first contention is misplaced because he misconstrues the trial court's ruling. To be fair, the trial court did expressly find that neither parent proved a material change of circumstances to justify a modification of **the parenting schedule**. However, the trial court implicitly found that Mother had proven a material change of circumstances concerning **the decision-making provision** in the Parenting Plan. *See Burchfield v. Burchfield*, No. M2017-01326-COA-R3-CV, 2019 WL 2185513, at *12 n.6 (Tenn. Ct. App. May 21, 2019) ("[I]t is implicit from the court's detailed findings of fact and conclusions of law, however, that the court determined that a material change in

circumstances had occurred due to [the father's behavior].”); *see also Turner v. Purvis*, No. M2002-00023-COA-R3-CV, 2003 WL 1826223, at \*4 (Tenn. Ct. App. Apr. 9, 2003) (“[W]e find the evidence does not preponderate against the trial court's implicit finding of a material change of circumstances.”).

A parenting plan is res judicata between the parties unless a new fact has occurred that materially alters the circumstances so that the best interest of the child requires a modification of the plan. *Hansen v. Hansen*, No. M2008-02378-COA-R3-CV, 2009 WL 3230984, at \*2 (Tenn. Ct. App. Oct. 7, 2009); *Dishman v. Dishman*, No. M2008-01194-COA-R3-CV, 2009 WL 1181341 at \*2 (Tenn. Ct. App. May 1, 2009). “A modification in decision-making authority is analyzed utilizing the same standards governing any modification of the parenting plan.” *Brunetz v. Brunetz*, 573 S.W.3d 173, 183–84 (Tenn. Ct. App. 2018) (citations omitted). “[O]nce the existence of a material change in circumstance has been found, the trial court should consider the factors listed in Tennessee Code Annotated § 36-6-106(a) to determine whether a modification is in the children's best interest.” *Id.* at 184 (citation omitted).

As our Supreme Court has stated,

> A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions. Thus, appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings.

*Armbrister*, 414 S.W.3d at 692–93 (citations omitted).

In Tennessee, trial courts speak through their orders. *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001). “Like other written instruments, orders and judgments should be interpreted and enforced according to their plain meaning . . . . and should be interpreted in light of the context in which it was entered, as well as the other parts of the record, including the pleadings, motions, issues before the court, and arguments of counsel.” *Morgan Keegan & Co. v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013). Thus, “[c]ourt orders and judgments, like other documents, often speak as clearly through implication as they do through express statements. Accordingly, when construing orders and judgments, effect must be given to that which is clearly implied, as well as to that which is expressly stated.” *Id.* (citations omitted).

It is readily apparent in reviewing the trial court's findings that the trial court impliedly found a material change of circumstance that necessitated a modification of the **decision-making authority** provision in the Parenting Plan.

The court expressly found Mother's testimony to be more credible than Father's. The court found that Father was incorrect in believing that Mother had exaggerated the

children's health issues, stating that "the health issues suffered by his daughter and younger son are real and if not expeditiously and properly treated, will significantly affect their current education, future education and future success in life." The court additionally found that "the Mother has generally made good medical and educational decisions that benefited the children" and that "the Mother has been forceful and proactive in attempting to secure treatment for her children which has included pushing the Father to make difficult decisions."

Because a trial judge is "uniquely positioned to observe the demeanor and conduct of witnesses," we afford considerable deference to issues that a trial court decides on the basis of witnesses' credibility. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). We will not re-evaluate a trial judge's assessment of a witness's credibility unless there is clear and convincing evidence to the contrary. *Id.* Evidence is clear and convincing if it "eliminate[s] any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* at 692–93 (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)). We find that the evidence fully supports the trial court's credibility findings.

Additionally, the trial court found that, "despite Father's best efforts and good intentions, the Father has been in denial about the severity of his daughter's issues and has actually been an impediment to the Mother's efforts to find her help." The court also found that Father had "inappropriately discussed parenting time issues with the parties' children" and had "made statements in the presence of the children, portraying himself as a victim which undermines the children's relationship with the Mother." The court found that "such behavior by the Father has contributed to the conflict in this case."

Moreover, the court posited that it is not the job of the parties' doctors to review the lengthy emails shared by the parties or to act as mediators in assisting the parties to reach a consensus. The court stated, "These healthcare providers should not be required to negotiate the treatment of their clients or patients because of the inability of the parents to work together." Because of these conflicts, the court found that the parties "have been unable to co-parent sufficiently to make joint non-emergency healthcare and educational decisions without conflict and delays." The court found that this was "detrimental to the physical and emotional well-being of the children." The court further found that "these conflicts and delays make the current joint decision-making authority of the parties **no longer in the best interest of the children**." (Emphasis added).

The failure of a joint decision-making provision in a parenting plan may constitute a material change of circumstance. In *Hansen v. Hansen*, No. M2008-02378-COA-R3-CV, 2009 WL 3230984 (Tenn. Ct. App. Oct. 7, 2009), the parties were divorced and had agreed to joint decision-making regarding their two minor children. *Id.* at *1. However, when the parties' minor child began having behavioral issues, the mother unilaterally scheduled a medical evaluation for the child without the father's consent. *Id.* In response to the father's petition to modify his child support obligation, the mother filed a counter-petition to

modify the parenting plan and grant her sole decision-making authority. *Id.* The trial court held for the mother and found that she "should have the final say in the decision making process in the event the parties are unable to reach an agreement in the decision making process regarding the children," but that the parties should "attempt to make joint decisions if possible." *Id.* at *2. On appeal, this court noted that there was ample evidence that the parties did not communicate well and had difficulty agreeing on a course of treatment for the child. *Id.* As a result, there were delays and gaps in the child's treatment. *Id.* Thus, the court in *Hansen* determined that joint decision making was no longer in the children's best interests, and it awarded the mother final decision-making authority for education, health care, and extracurricular activities. *Id.*; *see also Marlow v. Parkinson*, 236 S.W.3d 744, 749 (Tenn. Ct. App. 2007). Substantially similar facts are at issue here.

As this court stated in *Coley v. Coley*, No. M2007-00655-COA-R3-CV, 2008 WL 5206297 (Tenn. Ct. App. Dec. 12, 2008), "where the parents are unable to agree on matters of great importance to the welfare of their minor children, the primary decision-making authority must be placed in one parent or the other." *Id.* at *7. Here, it is clear that the parties are unable to agree on important matters regarding their children's medical and educational needs. As was the case in *Hansen*, the parties' conflicts have resulted in delays and gaps in their children's treatment.

Having reviewed the record, we find that the evidence does not preponderate against the trial court's implicit finding of a material change in circumstance concerning the decision-making provision in the Parenting Plan.

### B.  Allocation of Decision-Making Authority

Having found that a change in the decision-making protocol was needed, the trial court was then tasked with deciding whether granting Mother sole authority over educational and non-emergency medical decisions was in the children's best interests. *See id.*

As stated, once the existence of a material change in circumstance has been found, the trial court should consider the factors listed in Tennessee Code Annotated § 36-6-106(a) to determine whether a modification is in the children's best interest." *Brunetz*, 573 S.W.3d at 183–84 (citing *Allen v. Allen*, No. W2016-01078-COA-R3-CV, 2017 WL 908319, at *8 (Tenn. Ct. App. Mar. 7, 2017)). While not the preferred approach in modification cases,[7] where a trial court's findings demonstrate consideration of the relevant best interest factors and its findings correlate with the best interest factors, the trial court does not necessarily commit reversible error by failing to expressly reference its consideration of the statutory

---

[7] The better approach for trial judges is to expressly reference having considered the factors (citing thereto), to make clear findings which are expressly associated with the relevant factor or factors as to which they pertain, and to explain the court's reasoning in connection with its ultimate conclusion as to whether modification is in the best interest of the child.

factors generally or by failing to expressly associate particular findings with particular factors. *See Broadrick v. Broadrick*, No. M-2013-02628-COA-R3-CV, 2015 WL 1947186, at \*6 (Tenn. Ct. App. Apr. 29, 2015). Although the trial court did not expressly delineate the best interest factors set out in Tennessee Code Annotated § 36-6-106(a) by subsection, the trial court's findings of fact reveal that it considered the statutory best interest factors in making this decision, and we are able to discern the correlation between the trial court's detailed findings and the relevant best interest factors. *See id.; see also Clark v. Evans*, 778 S.W.2d 446, 449 (Tenn. Ct. App. 1989) ("[T]he trial court made no explicit finding that the visitation rights of the grandparents would be in the best interests of the child, but such a finding is implicit in his order allowing the visitation.").

For example, the trial court considered subsections (1) and (5) by recognizing that Mother had been the primary caregiver during the marriage and was the primary residential parent after the divorce.[8] The court also considered subsection (2) by recognizing that Mother has been more directly involved with the children, that Father has interfered with Mother's parenting time, and that Father has inappropriately discussed parenting issues with the children.[9] It also considered subsection (7) by recognizing the children's medical issues and Father's denial of the extent of the children's medical needs.[10] Having considered these and other relevant factors, the court determined that it was in the children's best interests for Mother to have "sole decision-making authority over their non-

---

[8] Tennessee Code Annotated § 36-6-106(a)(1) directs courts to consider "[t]he strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child." Section 106(a)(5) directs courts to consider "the degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities."

[9] Tennessee Code Annotated § 36-6-106(a)(2) reads as follows:

Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order

[10] Tennessee Code Annotated § 36-6-106(a)(7) directs courts to consider "the emotional needs and developmental level of the child."

emergency healthcare and day-to-day education, free of any interference or delays by the Father and without being required to consult with him in advance."[11]

Based on these and other relevant factors, as well as the trial court's findings, we find the trial court acted within its discretion to modify the Parenting Plan as noted above. Thus, we affirm the trial court's decision to modify the decision-making provisions in the Parenting Plan.

## C. Restrictions on Father's Involvement with the Children

Father next argues that the trial court erred in entering certain provisions into the new parenting plan that restrict his involvement with the children. The new parenting plan provides as follows regarding the children's non-emergency healthcare and day-to-day educational needs:

> Except in the event of an emergency, the Mother shall be responsible for making all medical or dental appointments for the children. The child's healthcare appointments shall not be scheduled during the Father's parenting time except with the written permission of the Father, who shall then be responsible for taking the child to the appointment. The Father shall not schedule nor cancel medical appointments for the children. The Mother shall make all day-to-day educational decisions including decisions related to the children's Individual Learning Plan (ILP).

. . . . .

> Beginning the 15th day of the month immediately following the entry of this order, Mother shall provide the Father an email by the 15th day of each month, updating the Father on all medical and educational decisions and issues affecting the children.

> Once per month, the Father may, at his sole expense, schedule an appointment with the children's pediatrician, clinical psychologist, or treating therapist to update himself on the children's issues and progress. During such session, the Father is not to discuss the parties' divorce, their disagreements over the treatment of the parties' children or make derogatory comments about the Mother or criticize her or her medical decisions in any way.

---

[11] The court also held that Mother may not change the children's school without written agreement from Father, and the parties shall continue to exercise joint decision-making authority on extracurricular activities of the children.

.    .    .    .

Mother is hereby granted sole decision-making authority for all non-emergency healthcare decisions related to or affecting the parties' minor child(ren), including but not limited to selecting the various healthcare providers, scheduling all intake and other appointments and approving all treatment suggested by the healthcare providers, without the input or the opinion of the Father, and free from his interference or control. Such appointments shall be scheduled at the convenience of the Mother during her parenting time and without the participation of the Father. However, the Mother shall select future healthcare providers from within the Father's insurance network unless the parties agree in writing to a healthcare provider outside the Father's network. The Mother may continue to use out-of-network healthcare providers previously agreed upon by the parties.

Further, all evaluations, testing or treatment of the child(ren) shall be medically necessary and covered by the Father's major medical insurance. The frequency of the evaluations, testing or therapy sessions shall be in compliance with the recommendations of the healthcare providers. However, nothing shall prevent the Mother from authorizing evaluations or tests not covered by said insurance at her own expense. In the event of a disagreement between the parties regarding the children's healthcare providers not covered by the insurance or necessary treatments or evaluations not approved or covered by the Father's insurance, nothing shall prevent either party from moving the Court for a deviation from the Permanent Parenting Plan by simple motion, with reasonable notice to the other party, and upon good cause shown.

The trial court also entered the following provision regarding contact with the children:

Except in the event of an emergency, neither parent shall attempt to communicate in any manner with the children during the other parent's parenting time except under the regular telephonic/Face Time communication schedule provided herein. However, the children may communicate with the non-possessory parent if they desire, provided such communication is reasonable as to the time of day and duration of contact. Neither parent shall order or request the children to contact her or him when the children are in the possession of the other parent.

First, Father argues that the trial court went too far in restricting his involvement in the children's non-emergency healthcare, given that he observes and spends time with the children 132.5 days out of the year. Thus, Father submits that his input is beneficial to the children's healthcare providers. Second, Father claims that restrictions on the parties'

- 17 -

ability to contact the children are improper, as there is no evidence that the parties' contact with the children has been harmful to them.

While the details of visitation arrangements are generally left to the discretion of the trial court, this discretion is not unbounded; it must be based on proof and appropriate legal principles. *Hogue v. Hogue*, 147 S.W.3d 245, 251 (Tenn. Ct. App. 2004) (citing *D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995)). In reviewing the trial court's visitation order for an abuse of discretion, the child's welfare is given "paramount consideration," and "the right of the noncustodial parent to reasonable visitation is clearly favored." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *Suttles v. Suttles, 748 S.W.2d 427, 429 (Tenn. 1988)*). Nevertheless, the noncustodial parent's visitation "may be limited, or eliminated, if there is definite evidence that to permit . . . the right would jeopardize the child, in either a physical or moral sense." *Id.* Such restraints on parental conduct must be well-defined and must involve conduct that competent evidence shows could cause harm to the child. *Hogue*, 147 S.W.3d at 251 (citing *Bates v. Bates*, No. 03A01-9412-CH-00426, 1995 WL 134907, at *3 (Tenn. Ct. App. March 30, 1995)). The purpose of these restraints is to protect the child. *Id.* We note that the trial court did not restrict Father's **visitation** rights. Rather, it placed restraints on his ability to interfere with the children's medical and educational needs and contact the children outside of his parenting time.

In its final order, the trial court emphasized that "both parents love their children, and each parent wants what is best for their children, but each parent has different ideas regarding what is best for them." The trial court proceeded to note that Father's involvement in the children's non-emergency healthcare has caused several conflicts between the parties, has placed the children's healthcare providers in the middle of these conflicts, and has resulted in delays in the children's treatment. The trial court explicitly found these delays to be "detrimental to the physical and emotional well-being of the children." The court also found that Father's involvement in the children's day-to-day educational decision-making was preventing the party's eldest child from attending a school that would better suit her educational needs.

As previously mentioned, the court cited instances where Father had undermined the children's relationship with Mother and had spoken to them about the Parenting Plan. The court further found that Father had planned activities with the children during Mother's parenting time. The court stated:

> He has also interfered with the Mother's parenting time by planning activities for the children on Mother's Day which appeared to make the Mother at fault when such plans, which the children looked forward to, had to be canceled because the Parenting Plan reserved Mother's Day for her. Likewise, he discussed an overseas trip with the children, knowing that the trip could not take place unless the Mother agreed to modify her parenting time by giving additional time to the Father. The Court finds such behavior to be manipulative and controlling.

The court then imposed specific, unambiguous parameters to ensure that the children would receive the medical treatment and educational attention that they needed without further delay and disagreement between the parties. The court also laid out clear restrictions to prevent the parties from interfering with one another's parenting time.

We find that, by inserting these restrictions into the Parenting Plan, the trial court properly balanced the needs and best interests of the children against Father's visitation and parental rights. The trial court recognized the parties' love for their children but ultimately found that the parties' increasingly uncooperative relationship was detrimental to the children's well-being. The court then prudently imposed specific restrictions on the parties' interactions with each other, the children, and the children's medical providers. We find no error in the trial court's analysis.

For the foregoing reasons, we find that the trial court acted within its discretion when it implemented the aforementioned restrictions.

## II. MODIFICATION OF CHILD SUPPORT

Father contends that the trial court erred when it denied his application to modify child support by including Father's 2020 real estate proceeds when calculating his monthly gross income and by finding no significant variance to justify modification of child support.

We begin our analysis by noting that "[t]he goal of the statutes and regulations governing child support is to assure that children receive support reasonably consistent with their parent or parents' financial resources." *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248–49 (Tenn. Ct. App. 2000) (citing *Shell v. Law*, No. 03A01-9608-CV-00251, 1997 WL 119581, at *4 (Tenn. Ct. App. Mar. 18, 1997)). "The statutes and regulations promote this goal by requiring the courts to set child support using guidelines developed by the Tennessee Department of Human Services to promote both efficient child support proceedings and dependable, consistent child support awards." *Id.* at 249 (citing Tenn. Code Ann. § 36-5-101(e); Tenn. Comp. R. & Regs. 1240-24-.02(2)(b), (c)).

Because setting child support is a discretionary matter, "we review child support decisions using the deferential 'abuse of discretion' standard of review." *State ex rel. Vaughn*, 21 S.W.3d at 248. "This standard requires us to consider (1) whether the decision has a sufficient evidentiary foundation, (2) whether the court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives." *Id.* (citing *BIF v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *2 (Tenn. Ct. App. July 13, 1988)). We "will set aside a discretionary decision if it rests on an inadequate evidentiary foundation or if it is contrary to the governing law," but "we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative." *Id.*

"In a child support modification case, the trial court's findings of fact are reviewed de novo with a presumption of correctness." *Massey v. Casals*, 315 S.W.3d 788, 793 (Tenn. Ct. App. 2009) (citing *Lacey v. Lacey*, No. W2002-02813-COA-R3-CV, 2003 WL 23206069, at *2 (Tenn. Ct. App. Oct. 31, 2003)). "The trial court's conclusions of law are reviewed de novo, with no presumption of correctness." *Id.* (quoting *Lacey*, 2003 WL 23206069, at *2).

## A. Calculation of Gross Income

When calculating Father's gross income for 2020, the court included Father's capital gain from the sale of real estate. Father argues that the trial court erred in doing so because he has not yet realized the relevant gains, given that the gains are deferred because they are invested in a QOZ. Moreover, Father notes that the relevant capital gains from the sale were not counted toward his 2020 income for federal tax purposes. Father submits that he will not "realize" the gains until they are removed from the QOZ, which will not occur for at least seven years.

For her part, Mother posits that Father is erroneously arguing that the determination of his income for federal tax purposes is synonymous with the determination of his income for child support purposes. In support of this argument, Mother cites multiple Tennessee cases that distinguished between the two. *See Abercrombie v. Abercrombie*, No. E2003-01226-COA-R3-CV, 2004 WL 626713 (Tenn. Ct. App. Mar. 29, 2004) ("Thus, while a tax return, generally speaking, will yield valuable data for a trial court in setting child support, it is a mistake to use the federal tax return as if the concepts . . . were interchangeable. They are not."); *In re Britton H-S.*, No. M2016-01576-COA-R3-JV, 2018 WL 1040945, at *8 (Tenn. Ct. App. Feb. 23, 2018) (reaffirming that the "definition of gross income and the type of allowable deductions in the Guidelines are not the same as those in the federal tax code"); *Owings v. Owings*, No. W2005-01233-COA-R3-CV, 2006 WL 3410702, at *1 (Tenn. Ct. App. Nov. 27, 2006) (affirming the proposition that income as defined by the Child Support Guidelines is not the same as income for federal tax purposes). She also contends that the cases that Father relies upon to support his argument on this issue are distinguishable.

The modification of child support payments is governed by Tennessee Code Annotated § 36-5-101(g), which requires courts to "decree an increase or decrease of support when there is found to be a significant variance, as defined in the child support guidelines . . . , between the guidelines and the amount of support currently ordered." Tenn. Code Ann. § 36-5-101(g)(1); *see Kaplan v. Bugalla*, 188 S.W.3d 632, 636 (Tenn. 2006); *see also Wine v. Wine*, 245 S.W.3d 389, 393–94 (Tenn. Ct. App. 2007). Thus, the initial inquiry in a petition for child support modification is "whether there is a 'significant variance' between the current obligation and the obligation set by the Guidelines." *Wine*, 245 S.W.3d at 394 (citing *Huntley v. Huntley*, 61 S.W.3d 329, 335 (Tenn. Ct. App. 2001)).

More specifically, "For all orders modified on or after November 7, 2020, for the case to be modified per the current Guidelines, there must be a at [sic] least a fifteen percent (15%) change between the amount of the current support order (not including any deviation amount) and the amount of the proposed presumptive support order." Tenn. Comp. R. & Regs. 1240-02-04-.05(2)(d). For this reason, "[t]o determine if a modification is possible," the tribunal must compare the presumptive child support order ("PSCO") from the original Child Support Worksheet with the PSCO that results from the proper application of the Guidelines to the parties' current circumstances. *See* Tenn. Comp. R. & Regs. 1240-02-04-.05(4). The parent seeking to modify a child support obligation has the burden to prove that a significant variance exists. *Wine*, 245 S.W.3d at 394.

As noted earlier, Father earns his income from buying, renovating, and selling real estate. In 2020, Father sold seven properties that he received in the division of marital estate. At the time of the division, these properties were collectively valued at $3.78 million. When he sold them, Father received $4.87 million. Thus, Father had a post-divorce "capital gain" of $1,085,239 for child support purposes. After selling the properties, Father invested the sales proceeds, including the capital gain, in a QOZ. Consequently, the gains were not reported on his 2020 income tax return, which showed a loss for 2020.[12] Father planned on keeping his money in the QOZ for seven years, after which the gains would be reported as income on his 2026 tax return.

Father's expert witness, Vic Alexander, presented the trial court with three different calculations to determine Father's income for child support purposes. We will discuss two of them. The first calculation excluded the sales proceeds and listed Father's 2019 gross income as $426,810 and his 2020 gross income as **negative** $252,430, resulting in an average income of $87,190, or $7,265 per month. The trial court observed that if it were to adopt this proposal, the Child Support Worksheet would require Mother to pay Father child support in the presumptive amount of $401 per month. On appeal, Mother notes that such an outcome would be an egregious miscarriage of the Guidelines when one considers Father's net worth is more than $10 million.

Mr. Alexander's second calculation included the capital gains Father invested in the QOZ and showed an income for Father in 2020 of $1,111,051. Under this second approach, Father's average income for 2019 and 2020 was $768,931, or $64,077.58 a month.

The trial court chose this second approach, reasoning as follows:

> In reality, the Father has only suffered a "paper loss" because he made an intentional decision to invest his profits from the sale of $4,870,000 worth

---

[12] Mother's forensic accountant, Tom Price, explained that the "Qualified Opportunity Zone Tax Credit" is not a "tax credit", but is instead a method for deferring a taxable gain from the sale of real property for seven years. Thus, pursuant to the federal tax code, at the time real estate profits are invested into a QOZ, they are not declared as income for federal income tax purposes.

of real estate which he owned, into the Qualified Opportunity Zone fund. With that decision, he exercised total control over the income he reports and therefore, over what child support he pays or does not pay. As a consequence of this investment strategy, he eliminates his income for child support purposes and his child support obligation. This Court sees nothing in the State Child Support Guidelines that intends to grant the obligor such freedom in determining his own income for child support purposes. Nor should the child support obligations of children in this state be sacrificed on the altar of congressional social and financial engineering. This Court specifically finds that it was not the intention of the State Child Support Guidelines to allow the obligor to manipulate his income in the guise of investments, thereby reducing or eliminating his child support obligation while his multi-million-dollar net worth and his upper income lifestyle remain untouched.

The trial court noted that "it is clear to this Court that the definition for income under the Child Support Guidelines and the definition for income under the Internal Revenue Service Code are not the same." We agree.

As this court reasoned in *Abercrombie v. Abercrombie*, No. E2003-01226-COA-R3-CV, 2004 WL 626713 (Tenn. Ct. App. Mar. 29, 2004),

While a federal income tax return is a valuable source of data when calculating an obligor's child support obligation under the Guidelines, it is important to recognize that the object of a tax return is very different from that of the Guidelines. A tax return is designed to determine "taxable income" under the federal tax code; the Guidelines are designed to determine "net income" as that concept is defined in the Guidelines. The Guidelines' "net income" concept is vastly different from the federal tax code's concept of "taxable income." By the same token, the Guidelines' concept of "gross income" is not the same as the federal tax code's concept of "adjusted gross income." Thus, while a tax return, generally speaking, will yield valuable data for a trial court in setting child support, it is a mistake to use the federal tax return as if the concepts mentioned above were interchangeable. They are not.

*Id.* at *7.

And as we also explained in *Owings v. Owings*, No. W2005-01233-COA-R3-CV, 2006 WL 3410702 (Tenn. Ct. App. Nov. 27, 2006):

**In this case, as in *Abercrombie*, we are governed by the income definitions in the Child Support Guidelines, not the tax code**. [Father's accountant] testified forcefully that Father's tax returns accurately reflected his "gross income" as derived from the K-1 forms and other documentation

- 22 -

furnished to [Father's accountant]. As in *Abercrombie*, "[i]n essence, the witness was expressing what is clearly true as a matter of tax law. . . ." [Father's accountant] did not testify as to Father's "gross income" under the Guidelines definition and acknowledged there was a difference.

*Id.* at *12 (emphasis added) (citations omitted) (quoting *Abercrombie*, 2004 WL 626713, at *2).

The foregoing notwithstanding, Father compares his investment in the QOZ with a 1031 Exchange. Father relies heavily on the decision in *Jenkins v. Jenkins*, 156 P.3d 1140 (Ariz. Ct. App. 2007), where the court found no change of circumstance to justify modification of the husband's child support when the husband sold $7.5 million of real estate and immediately reinvested the proceeds in a similar asset pursuant to a 1031 like-kind exchange. *Id.* at 1142. Significantly, however, Mr. Jenkins was a farmer who was not engaged in the business of speculating, developing, and selling real property. *Id.* The income Father seeks to defer for income tax purposes has been his primary source of income for years, which he derives from speculating in and developing real property. Thus, because the income Mr. Jenkins derived from the sale of real estate was not his primary business activity nor the primary source of income for child support purposes, *Jenkins* is distinguishable.

Moreover, while 1031 exchanges and QOZ investments each allow deferral of income tax, we find them to be distinguishable. As Mr. Price testified, while a QOZ is "like" a 1031 like-kind exchange, it is not a 1031 exchange except to the extent that the taxes are deferable. He went on to explain that a like-kind exchange requires an exchange of a like-kind piece of property. *Compare* 26 U.S.C. § 1031(a)(1) (applying to "the exchange of real property held for productive use in a trade or business or for investment . . . exchanged solely for real property of like kind which is to be held either for productive use in a trade or business or for investment") *with* 26 U.S.C. § 1400Z-2 (applying to the "gain from the sale to, or exchange with, an unrelated person of any property held by the taxpayer" and invested in "any investment vehicle which is organized as a corporation or a partnership for the purpose of investing in qualified opportunity zone property").

But here, Father did not **exchange** any of the seven pieces of real property for other **like-kind** properties. Instead, he **sold** all seven properties in the regular course of his real estate business and then invested the proceeds from the sale into a QOZ fund.

To counter Father's argument, Mother relies in principal part on *Conrad v. Conrad*, No. 06-MA-128, 2007 WL 1806655 (Ohio Ct. App. June 20, 2007). Unlike the father in *Jenkins*, Mr. Conrad was self-employed in the business of "property management." *Id.* at *1. The child support magistrate, who was tasked with setting child support, noted that Mr. Conrad's records showed capital gains of $42,779 resulting from real estate transactions, but his tax return reflected a net loss of $15,579. *Id.* The magistrate attributed $45,196 as

income for the father on the child support worksheet, explaining that because Mr. Conrad derived his income from the property management business, "it is not unreasonable to expect the gains received from the sale of various properties to be a recurring, rather than a one-time event." *Id.* Mr. Conrad appealed the magistrate's decision to the trial court.

The trial court noted that, in some years, Mr. Conrad claimed capital gains income and used the money to pay bills while in other years he used 1031 exchanges to defer capital gains taxes. *Id.* at *2. Thus, the trial court held that Mr. Conrad controlled how the proceeds from the sales of real property were used and reported, for example, whether to pay bills or place the proceeds into a 1031 exchange. *Id.* Therefore, the trial court ruled that because Mr. Conrad had the ability to control his income in this manner, he also had the ability to use the money to pay his child support obligation. *Id.*

On appeal, the Ohio Court of Appeals held that the facts in *Conrad* were distinguishable from prior cases because in none of the prior cases was there evidence that the obligor parent earned capital gains as regular income or that the capital gains were a recurring event. *Id.* at *5. The court also credited the magistrate's findings that Mr. Conrad "cannot be permitted to largely avoid his support obligation by continuing in a profession in which he claims he earns no assignable income from which he can pay support." *Id.* at *7. Thus, the Court of Appeals held that "[b]ecause there is evidence to support the conclusion that [Mr. Conrad] is engaged in the business of buying and selling real estate, it was reasonable for the court to include [his] capital gains from the sale of real estate as income when computing child support." *Id.* at *6.[13]

Here, as was the case in *Conrad*, Father is engaged in the real estate business. Thus, as the trial court noted in its memorandum opinion, the sale of real estate was Father's primary source of income and Father controlled whether to use the income from the real estate transactions for paying monthly expenses, or whether to place the sales proceeds into a QOZ investment to defer recognizing the net sales proceeds as income for federal income tax purposes. We are also persuaded by the reasoning in Tennessee cases which recognize the fallacies of a parent controlling, or manipulating, his or her income for child support purposes while maintaining a comfortable lifestyle. For example, in *Koch v. Koch*, 874 S.W.2d 571 (Tenn. Ct. App. 1993), we affirmed the trial court's finding that the parent earned $4,000 per month based on evidence that the father's company, of which he was the sole owner, was profitable and that the father used company funds to pay his expenses. In *Sandusky v. Sandusky*, No. 01A01-9808-CH-00416, 1999 WL 734531, at *4 (Tenn. Ct.

---

[13] We also note that the Ohio Court of Appeals limited its holding in *Conrad* to the specific facts of that case, stating that "[i]f the evidence did not indicate that [Mr. Conrad] derived his income from the buying and selling of real estate then it would seem clear that capital gains from the sale of one parcel of property by [Mr. Conrad] would be a nonrecurring event not subject to inclusion as income for child support computation purposes." *Conrad*, 2007 WL 1806655, at *6. Unlike in Ohio, in Tennessee isolated capital gains are not exempt from inclusion as gross income. *See Moore v. Moore*, 254 S.W.3d 357, 360 (Tenn. 2007).

App. Sept. 22, 1999), we rejected the parent's request to modify child support based on self-imposed salary decrease, while in *Mitts v. Mitts*, 39 S.W.3d 142 (Tenn. Ct. App. 2000) we distinguished our holding in *Sandusky* on ground that the parent was "not the sole shareholder" and, thus, he did not have control over distributions. Also, in *Wills v. Wills*, No. M2002-02167-COA-R3-CV, 2003 WL 22209357, at *2 (Tenn. Ct. App. Sept. 25, 2003) we affirmed the trial court's decision to treat business income as personal income when the parent had "the ability to control the amount of income that he receive[d] from the business."

Both the trial court's findings and the record establish that Father has substantial assets, which he uses to maintain his elevated lifestyle, and as we noted earlier, "[t]he goal of the statutes and regulations governing child support is to assure that children receive support reasonably consistent with their parent or parents' financial resources." *State ex rel. Vaughn*, 21 S.W.3d at 248–49 (citations omitted). Moreover, one of the major goals in the development of the Guidelines was "[t]o ensure . . . to the extent that either parent enjoys a higher standard of living, the child[ren] share[s] in that higher standard." *Alexander v. Alexander*, 34 S.W.3d 456, 463 (Tenn. Ct. App. 2000) (citing Tenn. Comp. R. & Regs. 1240-02-04-.02(2)(e)).

For these reasons, and the fact that a tax return is designed to determine "taxable income" under the federal tax code while the Child Support Guidelines are designed to determine "gross income" as that concept is defined in the Guidelines, *see Abercrombie*, 2004 WL 626713, at *7, we find no error with the trial court's decision to distinguish the effect of federal income tax law upon Father's 2020 income in determining Father's income for child support purposes. As the trial court found, Father had the ability to control how his income would be reported and, by utilizing this control, he made the calculated decision to place the net proceeds from the sale of seven properties into a QOZ fund while maintaining a lavish lifestyle. Thus, to be consistent with the goal of the statutes and regulations governing child support, which are to assure that children receive support reasonably consistent with their parents' financial resources, *see State ex rel. Vaughn*, 21 S.W.3d at 248–49, we affirm the trial court's decision to include the capital gains as income for child support purposes.

B. Significant Variance

Having included the net capital gains as Father's 2020 income for child support purposes, the trial court determined the parties' gross monthly incomes and ran a new child support worksheet, recalculating Father's presumptive child support obligation. The worksheet showed that Father's presumptive monthly child support obligation would remain the same, at the maximum allowed for two children:

> Adding back . . . the funds invested in the QOZ as net capital gains for child support purposes, the Father realizes income for child support purposes of $1,111,051. This Court finds this amount to be income to the Father as

income is defined for child support purposes under the State Child Support Guidelines. Averaged with the Father's income for 2019 of $426,810, which the Court finds to be reasonable with such variable income, the Father's average income over these two (2) years is $768,931. Using this figure as the Father's income for 2020, the Court finds the Father has average gross monthly income of $64,077.58 per month. Preparing a Child Support Worksheet using this average gross monthly income results in the Father continuing to pay the maximum child support under the Guidelines of $3,200 for two (2) minor children.

Thus, due to the lack of a significant variance, the trial court correctly declined to modify Father's child support obligation. Accordingly, we affirm the trial court's decision.

III. MODIFICATION OF THE PARTIES' OTHER FINANCIAL OBLIGATIONS

Father next argues that the trial court erred in denying his petition to modify the additional child support obligations that he voluntarily assumed in the Parenting Plan. In particular, Father asked the trial court to reallocate financial responsibility for the children's educational, extracurricular, and uncovered medical expenses. Father submits that multiple changes of circumstance justify modification of these agreed-upon provisions.

First, Father notes that, since the divorce, his gross annual income has decreased by $431,069, while Mother's has increased by $24,839. Second, Father notes that, although the trial court divested him of his joint decision-making authority for both education and non-emergency healthcare decisions, he is still required to pay the entirety of the children's education and the first $25,000 of the children's uncovered medical expenses. Third, Father notes that he now pays $10,000 more in yearly tuition for Claire's new school than he did for her former school. And fourth, Father claims that, at the time of the divorce, he could not have anticipated the extent and cost of Claire's current therapy. As a result, Father submits that the cost of the children's private school, uncovered medicals, and extracurriculars should be split by the parties on a pro-rata basis.

Under Tennessee law, parties are free "to agree 'to a child support obligation that exceeds the amount payable directly to an obligee parent under the Guidelines and to a method . . . that differs from the mechanism contemplated by the Guidelines as long as the resulting child support meets or exceeds the amount mandated under the Guidelines.'" *Jones v. Jones*, No. M2009-01512-COA-R3-CV, 2010 WL 2025403, at *4 (Tenn. Ct. App. May 20, 2010) (quoting *Kesser v. Kesser*, 201 S.W.3d 636, 642 (Tenn. 2006)); *see also* Tenn. Code Ann. § 36-5-101(j) (stating that child support statue does not affect parties' right to enter agreement). It is well-settled that these types of settlement agreements are enforceable as contracts. *Harbour v. Brown for Ulrich*, 732 S.W.2d 598, 600 (Tenn. 1987). However, an agreement between parties involving the legal duty of child support during the child's minority "loses its contractual nature when merged into a decree." *Penland v.*

*Penland*, 521 S.W.2d 222, 224 (Tenn. 1975). "Because the provision merges into the decree, the child support obligation is subject to modification by the trial court." *Jones*, 2010 WL 2025403, at *4 (quoting *Allison v. Hagan*, 211 S.W.3d 255, 260 (Tenn. Ct. App. 2006)).

Under the Guidelines, the cost of private education may be added to the presumptive child support order as an "extraordinary educational expense." *See* Tenn. Comp. Regs. & R. 1240.02.04.07(2)(d) ("Extraordinary educational expenses include, but are not limited to, tuition, room and board, lab fees, books, fees, and other reasonable and necessary expenses associated with . . . private elementary and/or secondary schooling that are appropriate to the parents' financial abilities and to the lifestyle of the child if the parents and child were living together."); *see also Barnett v. Barnett*, 27 S.W.3d 904, 907 (Tenn. 2000) ("[T]he guidelines contemplate private school tuition to be an 'extraordinary educational expense' because the tuition exceeds or departs from the cost of public schooling . . . ."). Similarly, extracurricular expenses may be added to the presumptive child support order as a "special expenses." Tenn. Comp. R. & Regs. 1240.02.04.07(2)(d); *see Reeder v. Reeder*, 375 S.W.3d 268, 276 (Tenn. Ct. App. 2012) ("Cheerleading expenses are plainly contemplated as a 'special expense' . . . ." (citing *Atkins v. Motycka*, No. M2007-02260-COA-R3-CV, 2008 WL 4831314, at *7 (Tenn. Ct. App. Nov. 6, 2008)). Because such expenses "are highly variable among families," they "are considered on a case-by-case basis in the calculation of support and are added to the basic support award as a deviation." Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d).

Generally, the decision of whether to deviate from the Guidelines to account for extraordinary expenses is within the trial court's discretion. *See id.* 1240.02.04.07(2)(d)(1)(i) and (2)(d)(2)(i) (stating that such expenses "may" be added).[14] If a court chooses to do so, it must explain its decision in the order and include "a monthly average of these expenses . . . on the Worksheet." *Id.* 1240.02.04.07(1)(c), (2)(d)(1)(iii); *see id.* 1240-02-04-.07(2)(d)(2) (requiring extracurricular expenses to be "quantified"). Once entered, a deviation may be eliminated "[i]f the circumstances that supported the deviation cease to exist, . . . irrespective of compliance with the significant variance requirement." *Id.* 1240-02-04-.07(2)(A)(2).

Here, the parties agreed that Father would pay, in relevant part, (1) all of the children's private school tuition and expenses, at their present school or any future school and (2) the first five thousand dollars for each child for costs of any and all agreed to extracurricular activities after which expenses would "be paid *pro rata* based on the parties' income as set forth on the child support worksheet then in effect." Both Mother and Father characterize these obligations as "upward deviations."

---

[14] Under a prior version of the Guidelines, courts were required to include private education costs when calculating child support. *See Kaplan*, 188 S.W.3d at 638.

But Father's obligations for private school tuition and extracurricular expenses were not included as "deviations" in the Parenting Plan or on the Child Support Worksheet—nor could they have been—without being "quantified." *See* Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d)(2). This appears to be by design. The parties agreed that Father would pay for private school at the children's present school or "**another school** (public or private)." Thus, the parties contemplated that the children might change schools in the future, and if they did, Father would still be responsible for the cost, whatever that cost might be.[15] Similarly, Father was to pay the first $5,000 "for costs of any and all agreed to extracurricular activities, said costs including but not limited to sports, music, and summer camps, to include but not to be limited to fees, equipment, and travel costs for each child." Again, by using this broad, open ended language, it is clear that the parties did not intend to set a specific monthly amount for Father to pay.[16]

For these reasons, we respectfully disagree that Father's responsibility for private school tuition and the first $5,000 of extracurricular expenses can accurately be described as "deviations," as that term is used in the Guidelines.

We reach the same conclusion for a different reason with regard to Father's responsibility for the first $25,000 of the children's uncovered medical expenses. Like extraordinary expenses, uncovered or "uninsured" medical expenses are "not included in the basic child support schedule." Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(d). But unlike extraordinary expenses, **recurring** uncovered medical expenses are factored into the calculation of the presumptive child support order ("PSCO") as an adjustment. *See* Tenn. Comp. R. & Regs. 1240-02-04-.08(2)(e)(1) (stating that presumptive child support order "is the difference between the [parents' adjusted support obligations]"); *id.* 1240-02-04.04(9) (stating that adjusted support obligation includes "the parent's share of any additional expense paid by the other parent and/or non-parent caretaker for the child's health insurance premium, recurring uninsured medical expenses, and work-related childcare").

The Guidelines treat **non**-recurring medical expenses differently:

If uninsured medical expenses are not routinely incurred so that a specific monthly amount cannot be reasonably established, a specific dollar amount shall not be added to the basic child support obligation but the court order

---

[15] An obligation to pay school expenses is not unlimited, even when it falls outside the scope of the Guidelines. *See Pylant v. Spivey*, 174 S.W.3d 143, 155 (Tenn. Ct. App. 2003) ("The fact that an agreement does not set a specific amount or otherwise identify a measurable limit does not mean that the obligation is unlimited or that the child can unilaterally obligate the parent to pay an unreasonable amount.").

[16] It is also notable that Father retained his joint authority over extracurricular activities, and his obligation to pay for extracurricular activities extends only to "costs of any and all **agreed to** extracurricular activities." (Emphasis added).

shall specify that these expenses shall be paid by the parents as incurred according to each parent's percentage of income unless some other division is specifically ordered by the tribunal.

Tenn. Comp. R. & Regs. 1240-02-04-.04(8)(d)(3); *see also* Tenn. Code Ann. § 36-5-101(h)(1) (authorizing trial courts to "direct the acquisition or maintenance of health insurance covering each child of the marriage" and to "order either party to pay all, or each party to pay a *pro rata* share of, the healthcare costs not paid by insurance proceeds").

Here, the parties did not establish a specific dollar amount for uncovered medical expenses, opting instead to specify that Father would pay the first $25,000, after which the parties would share the responsibility *pro rata*.

Neither the child support statute nor the Guidelines provide a standard for reallocating general responsibility for extraordinary expenses or non-recurring uncovered medical expenses. Because the parties in this case included these provisions as part of the larger Parenting Plan, we conclude that the appropriate modification standard is the general standard for modifying permanent parenting plans, not the standard for modifying deviations on a child support worksheet. *Cf. Brunetz*, 573 S.W.3d at 183–84 (applying material change standard to reallocation of decision-making authority).

"In assessing a petition to modify a permanent parenting plan, the court must first determine if a material change in circumstances has occurred and then apply the 'best interest' factors of section 36-6-106(a)." *Armbrister*, 414 S.W.3d at 697–98. Here, the trial court denied Father any relief concerning his additional financial obligations based on its "ruling on the Father's income":

> [T]he parties' agreed Permanent Parenting Plan was extensively negotiated, and each party was well represented by experienced family law attorneys. Each party understood what the other was receiving as his or her share of the marital estate and the other party's average gross monthly income. Not only did the Father acknowledge that his income and wealth were such that paying the maximum amount of child support under the guidelines for two (2) children was appropriate, but he agreed to additional support obligations to assist the Mother in defraying the cost of caring for the children and maintaining the lifestyle to which the children had become accustomed. **Based on this Court's ruling on the Father's income,** the Court finds no basis to reduce the additional support obligations which the Father voluntarily assumed.

(Emphasis added).

As discussed, the court's ruling on Father's income included its finding that Father's reduction in income was only a "paper loss" and "that it was not the intention of the State

- 29 -

Child Support Guidelines to allow the obligor to manipulate his income in the guise of investments, thereby reducing or eliminating his child support obligation while his multi-million-dollar net worth and his upper income lifestyle remain untouched." In other words, the court found no material change of circumstance occurred in the 13 months that passed between the divorce and the time Father filed his petition that warranted reallocation of financial responsibility for educational, medical, and extracurricular expenses.

Based on the foregoing, we find the trial court appropriately exercised its discretion in denying Father's Petition to Modify.

IV. ATTORNEY'S FEES AWARDED BY THE TRIAL COURT

Father contends that this court should vacate the trial court's award of Mother's attorney's fees associated with the litigation regarding three issues: The school issue, decision-making authority, and child support pursuant to § 36-5-103(c). Mother insists that the trial court's decisions should be affirmed since the provisions regarding non-emergency and educational decision-making authority had become unworkable, and thus, she had no choice but to petition the court to make changes to those provisions. She also insists she was entitled to recover her reasonable and necessary fees for bringing these claims, and for defending Father's Petition to Modify Child Support pursuant to the MDA and under Tennessee Code Annotated § 36-5-103(c), because she was the prevailing party.

An award of attorney's fees is considered to be within the sound discretion of the trial court, and will not be reversed on appeal if that discretion is not abused. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002) (citing *Garfinkel v. Garfinkel*, 945 S.W.2d 744 (Tenn. Ct. App. 1996)). Tennessee Code Annotated § 36-5-103(c) empowers the courts to award reasonable attorney's fees incurred by persons who are required to return to court to enforce a child support order. *Richardson v. Spanos*, 189 S.W.3d 720, 729 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-5-103(c) states that

> [t]he plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Tenn. Code Ann. § 36-5-103(c).

The trial court found Mother to be the prevailing party under Tennessee Code Annotated § 36-5-103(c) in the areas of the litigation dealing with decision-making

authority, including the school issue, and resisting Father's petition for modification of child support. However, Father contends that the evidence in the record fails to support the trial court's justifications for awarding these fees.

Father notes that the trial court found that, based on his actions and attitudes, Mother's litigation to compel Claire's attendance at the new school was necessary for the Father to come to terms with his daughter's health issues and the reality that she likely would not have been successful at her former school. More specifically, Father insists that the trial court's findings regarding Father's "actions and attitudes" and his "com[ing] to terms with his daughter's health issues" are not supported by the record. We respectfully disagree and find that the evidence preponderates in favor of the trial court's findings on these facts.

With regard to the other two issues—the award of fees for litigation regarding decision-making and child support modifications—Father simply requests, "If either or any of the rulings on these topics are reversed, then the trial court's order regarding fees should be similarly vacated." We have affirmed the trial court's rulings on these issues. Given that Mother remains the prevailing party on these issues, we see no reason to overturn the trial court's discretionary decision concerning the attorney's fees Mother incurred in the trial court.

Accordingly, we affirm the award of Mother's attorney's fees incurred in the trial court.

## V. ATTORNEY'S FEES INCURRED ON APPEAL

Both parties seek to recover the attorney's fees and costs incurred in this appeal.

"Whether to award attorney's fees on appeal is a matter within the sole discretion of this Court." *Hill v. Hill*, No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Tenn. Ct. App. Dec. 17, 2007) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). In determining whether an award is appropriate, we take into consideration "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered." *Id.* at *6 (*citing Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 WL 22071454, at *10 (Tenn. Ct. App. Sept. 3, 2003)).

Considering that Mother has succeeded on every issue on appeal and has demonstrated good faith throughout these proceedings, we respectfully deny Father's request to recover his attorney's fees and hold that Mother is entitled to her attorney's fees on appeal. On remand, the trial court should determine the reasonable and necessary attorney's fees Mother incurred on appeal and make an appropriate award after considering the relevant factors.

## IN CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the appellant, William H. Smallman.

_____
FRANK G. CLEMENT JR., P.J., M.S.